## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**LAURA N. OLLE**
**PETER J. OLLE**
4200 Military Road, NW
Washington, DC 20015,

                      Plaintiffs,

          v.

**5401 WESTERN AVENUE**
**RESIDENTIAL, LLC**
Serve: Lamont Hoffman, Registered Agent
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016,

**5401 WESTERN PNH, LLC,**
Serve: Lamont Hoffman, Managing
Member
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016,

**PN HOFFMAN REALTY, LLC**
Serve: Lamont Hoffman, Managing
Member
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016,

          and

**LAMONT HOFFMAN**
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016,

                 Defendants.

**Civil No. _____**

## COMPLAINT

COME NOW Plaintiffs, Laura N. Olle and Peter J. Olle (collectively, the "Olles"), by counsel, and herewith file their Complaint against the Defendants, for violation of the Interstate Land Sales Full Disclosure Act ("ILSFDA" or "Act"), 15 U.S.C. § 1701 *et seq.*, and pendent state claims, and in support thereof aver:

### *Parties, Jurisdiction and Venue*

1.     The Olles are adult citizens and residents of the District of Columbia.  The Olles are purchasers within the meaning of 15 U.S.C. § 1701(10).

2.     Defendant 5401 Western Avenue Residential, LLC ("5401 Residential") is, upon information and belief, a limited liability company organized under the laws of Delaware, and authorized to do business in, the District of Columbia.

3.     Defendant 5401 Western PNH, LLC ("5401 PNH") is, upon information and belief, a limited liability company organized under the laws of Delaware, and authorized to do business in, the District of Columbia.  5401 PNH is the managing member of 5401 Residential.

4.     Defendant PN Hoffman Realty, LLC ("PNH") is a District of Columbia limited liability company duly authorized to conduct business in the District of Columbia.  Upon information and belief, it sometimes

trades as, or uses as a fictitious name, "PN Hoffman, Inc." No such entity known as PN Hoffman, Inc., is organized and registered in the District of Columbia. For purposes of this Complaint, PNH shall include, and also refer to, the organization known and referred to as PN Hoffman, Inc.

5.     Defendant Lamont Hoffman ("Hoffman") is the managing member of 5401 PNH, and PNH. He also is an owner or person in control of related entities engaged in interstate real estate development and sales subjecting him to regulation under the Act.

6.     Each of 5401 Residential, 5401 PNH, PNH, and Hoffman is a developer, within the definition provided in 15 U.S.C. § 1701(5), as it relates to a subdivision, as defined in 15 U.S.C. § 1701(3), known as "Chase Point Condominium," located at 4301 Military Road, NW, Washington, DC 20016.

7.     Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331, and 15 U.S.C. § 1719.

8.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b), and 15 U.S.C. § 1719.

9.    All acts complained about and which give rise to these causes of action occurred in this District, and they all relate to the sale of real property interests located in this District.

### Facts Common to All Counts

10.    On or about October 8, 2004, the Olles entered into a "Non-Binding Reservation Agreement" whereby they agreed with 5401 LLC, as the owner or contract purchaser of the property for the right to purchase Penthouse Unit 1 (the "Unit") for approximately Two and One-half Million Dollars ($2.5 million) in a to be built condominium project to be known as "The Chase Point Condominium."  At that time the Olles gave 5401 LLC a deposit therefor totaling One Hundred Twelve Thousand Four Hundred Ninety-five Dollars ($112,495.00).  A copy of the Non-Binding Reservation Agreement is attached hereto as Exhibit 1, and the provisions thereof are incorporated herein by this reference.

11.    On or about the 23rd of December 2004, the Olles executed the formal sales contract  (the "Contract") for the purchase of the Unit, together with limited common element parking spaces numbered four and five for a total price of Two Million Two Hundred Forty-nine Thousand Nine Hundred Dollars and Forty-two Thousand Dollars ($2,249,900.42), respectively.  The Olles also increased the previously

4

made deposit by a like amount resulting in a total cash deposit of Two Hundred Twenty-nine Thousand One Hundred Ninety Dollars ($229,190.00) (the "Deposit"). 5401 LLC ratified the Contract on or about January 14, 2005. A copy of the ratified Contract is attached hereto as Exhibit 2, and the provisions thereof are incorporated herein by this reference.

12.    On or about December 15, 2006, 5401 LLC and the Olles entered into a Change Order Agreement pursuant to which the Olles made additional payments to 5401 LLC totaling Thirty Thousand Seven Hundred Sixteen and 00/100 Dollars ($30,716.00). As a result the Olles total at risk Deposit increased to Two Hundred Fifty-nine Thousand Nine Hundred Six and 00/100 Dollars ($259,906.00), exclusive of interest and attorneys' fees. A copy of the Change Order Agreement is attached hereto as Exhibit 3, and the provisions thereof are incorporated herein by this reference.

13.    Contract § 2.2 obligated 5401 LLC to hold the Deposit "in an interest-bearing escrow account in a bank or savings and loan association" as required by local law. Any interest earned on the Deposit was to be added thereto. But, according to 5401 LLC, the Deposit would

"not be deemed to include any amounts paid for Options," as defined in the Contract.

14.    Section 2.3, of the Contract provided that the Deposit would be credited to the Olles if the parties closed the transaction. Otherwise, if the Olles defaulted, it would be forfeited to 5401 LLC. In addition, the Contract provided that the Olles would forfeit any other amounts paid under the Contract including any amounts paid for Options, which 5401 LLC would retain as "liquidated damages."

15.    Section 7.4 of 5401 LLC's Contract with the Olles provided that if closing did not occur within twenty-four months after the execution of the Contract by the Olles (December 22, 2006) due to reasons within 5401 LLC's control, but before 5401 LLC established a closing date, the Olles' only remedy was to terminate the Contract by written notice to 5401 LLC and receive a refund of the Deposit (but not the cost of Options), or wait until the Unit was completed and 5401 LLC called for closing. These remedies were declared to be the Olles' "sole and exclusive remedies in the event of any default" by 5401 LLC, "it being expressly agreed and understood that [the Olles] . . . [were required to] waive[ ] any claims against [5401 LLC] for any monetary or consequential damages of any kind." This Contract provision eliminated

6

the Olles' right to sue for specific performance and or damages under District of Columbia law.

16.    5401 LLC's Contract with the Olles only obligated 5401 LLC to use "reasonable efforts to complete construction of the Unit," and convey it within the time when 5401 LLC was legally obligated to do so, viz., December 22, 2006, and further reserved to itself the right to delay its obligation to close beyond that date "for reasons beyond the control of 5401 LLC," which 5401 LLC defined without limitation, to include "impossibility of performance, acts of God, fire, earthquake, flood, explosion, terrorism, condemnation, or acts of governmental agencies asserting jurisdiction over the Condominium or the Property, and any other legally supportable justification under the laws of the District of Columbia, which would excuse 5401 LLC from completing the Unit" within the required time.  Finally, if closing did not occur due to any of those reasons, 5401 LLC's sole obligation to the Olles was to refund the Deposit and fees paid for Options.

17.    On May 2, 2005, 5401 LLC advised the Olles in writing that their Chase Point Unit would not be completed until the end of 2006.  As a result of 5401 LLC's delay in completing the Unit, as well as 5401 LLC's policy expressed in the Contract and elsewhere that the Olles were

prohibited from entering the construction site, the Olles were unable to see the Unit or make any investigations or inspections of the Unit for more than two years following the execution of the Contract. A copy of the May 2, 2005, letter is attached hereto as Exhibit 4, and the provisions thereof are incorporated herein by this reference.

18.    On January 29, 2007, 5401 LLC purported to give the Olles the notice of closing referenced in § 7.1 of Contract. The notice letter stated that closing on their Unit would be on May 17, 2007, after the final pre-settlement inspection required by the Contact. That same letter advised the Olles that their initial pre-settlement walkthrough would not occur until May 11, 2007. This additional four month delay was because the Unit was not completed subject only to minor punch list items as described in §9.1 of the Contract. A copy of this letter is annexed hereto as Exhibit 5, and the terms thereof are incorporated by this reference.

19.    The effect of the January 29, 2007, letter was to put the Olles' Deposit at risk, despite the fact that the amount of time between the notice letter and the date of closing was unreasonably long, and given well before the Unit was substantially complete. The effect of the January 29, 2007, letter was to deprive the Olles of their right to terminate the Contract and to receive their Deposit back.

20.    On February 26, 2007, the Olles were finally permitted access to the Unit for the first time.  At this time they realized they would not receive what they had contracted for.  They also realized that certain of the marketing materials used by 5401 LLC were false and or deceptive and or misleading.

21.    On March 30, 2007, the Olles sent a letter to 5401 LLC, terminating the Contract and requesting the return of their Deposit.  The basis asserted in the letter was that the construction had taken in excess of two years from the date of the Contract, and that the Olles they felt deceived by 5401 LLC about the size of two of the rooms in the Unit because the marketing materials falsely and deceptively showed the dimensions to be in excess of one hundred square feet larger than the actual measurements of the Unit as constructed when notice of closing was given to the Olles.  A copy of this letter is annexed hereto as Exhibit 6, and the terms thereof are incorporated by this reference.

22.    On April 2, 2007, 5401 LLC rejected the Olles' request and stated that if they did not close they would forfeit the Deposit.  A copy of this letter is annexed hereto as Exhibit 7, and the terms thereof are incorporated by this reference.

23.    On April 3, 2007, the Olles reiterated their termination of the Contract and requested a refund of the Deposit.  5401 LLC rejected the Olles' request and stated that if they did not close they would forfeit the Deposit.  A copy of this letter is annexed hereto as Exhibit 8, and the terms thereof are incorporated by this reference.

24.    The Olles declined to close, and 5401 LLC forfeited the Olles Deposit.

25.    The Olles received a copy of the "Public Offering Statement," filed with the District of Columbia, Department of Consumer and Regulatory Affairs ("POS").  Upon information and belief the POS was not issued pursuant to state law and regulation certified by HUD pursuant to 15 U.S.C. § 1708.

26.    The POS contains material misstatement of fact or omissions in that the Unit sold to the Olles was 100 square feet less than represented to them by one or more of the Defendants or their agents and representatives.

27.    At no time prior to wrongfully forfeiting the Olles' Deposit was the POS modified and amended to reflect this fact and delivered to the Olles.  At no time prior to wrongfully forfeiting the Olles' Deposit were the

Olles given notice of their right to rescind the Contract under DC law as a result of this material change in the size of the Unit.

28.    As a result of the Defendants' joint or several conduct, the Olles have been damaged in an amount equal to not less than the amount of the Deposit, loss of use of said funds, including accrued interest thereon prior to forfeiture, loss of use of said funds since said wrongful forfeiture, attorneys fees and other litigation expenses incurred and to be incurred, and such other damages as shall become apparent hereinafter.

## COUNT I
### *(Violation of ILSFDA - Failure to Register)*

29.    The Olles incorporate herein by reference all of the above allegations as if restated in full.

30.    At the time the Contract was executed, there was no statement of record with respect to the Unit or the Chase Point Condominium on file with the Secretary of the Department of Housing and Urban Development ("HUD"), as required by 15 U.S.C. §§ 1703(a)(1)(A), 1704, 1706.

31.    5401 LLC is one of several entities controlled or owned by PNH.  In addition to the Chase Point Condominium, PNH claims ownership or control of developments known as The Alta at Thomas

Circle, Washington, DC containing 126 condominium units; The
Condominiums at Carlyle Square (in conjunction with Post Properties) in
Alexandria, VA; The Flats at Union Row, in Washington, DC, with over
200 units, and The Warehouses at Union Row with not less than 50
units.  PNH advertises and solicits sales of these residential real estate
interests in interstate commerce utilizing the mail, Internet and other
telecommunications devices and methods.  Upon information and belief,
none of these developments are covered by a statement of record on file
with HUD as required by 15 U.S.C. §§ 1703(a)(1)(A), 1704, 1706.

32.    The methods and means by which Defendants conduct their
business with respect to The Chase Condominium and other projects
constitutes a common promotional plan including, without limitation,
common advertising, common ownership, and same or similar name or
brand identity, and common sales activities, including a common sales
center within the meaning of 15 U.S.C. § 1701(4).

33.    Alternatively, The Chase Condominium alone, is not subject
to or covered by any registration exemption under the Act.

34.    The May 2, 2005, letter from 5401 LLC advising the Olles that
their Unit would not be completed until the end of 2006, was designed
and intended to induce the Olles not to exercise their right to terminate

12

the Contract before the expiration of the second year next following execution of the Contract. The May 2, 2005 letter failed to contain a statement that the Olles could rescind the Contract. Such omission was designed and intended to dissuade the Olles from terminating the Contract, and was relied on and caused the Olle's to not exercise their right of rescission.

35.    The Olles first discovered this violation when they consulted counsel after 5401 LLC, failed and refused to refund their Deposit. Since discovering 5401 LLC's violation of the ILSFDA, the Olles made one additional written request through counsel prior to filing this suit, requesting that 5401 LLC rescind the Contract and refund the Olles' Deposit. 5401 LLC, through counsel declined the request. A copy of the letter to 5401 LLC is annexed hereto as Exhibit 9, and the terms thereof incorporated by this reference.

36.    Defendants 5401 PNH, Hoffman, and PNH are statutorily liable for the acts and conduct of 5401 Residential pursuant to the Act.

## COUNT II
*(Violation of ILSFDA - Failure to Deliver Property Report)*

37.    The Olles incorporate herein by reference all of the allegations in paragraphs 1-28, and 30 -36, as if restated in full.

38.   At no time prior to the date the Olles executed the Contract did any of the Defendants deliver to the Olles the interstate land sale property report required by 15 U.S.C. § 1703(a) ("HUD Property Report").

39.   The Contract fails to include the information required by the ILSDA when the HUD Property Report is not delivered prior to the execution of the Contract.

40.   At no time since signing the Contract, have the Olles received the required HUD Property Report.

## COUNT III
### *(Violation of ILSFDA - False Statements)*

41.   The Olles incorporate herein by reference all of the allegations in paragraphs 1-29, 30-36, and 38-40, as if restated in full.

42.   The POS, other advertising and promotional material, and the statements of Defendants' agents, at various times communicated, or contained, information which was misleading and false including the size of the Unit in violation of 15 U.S.C. § 1703(a).

43.   The Defendants, and or their agents at various times communicated or delivered documents that were false and misleading to the detriment of the Olles' statutory rights in that they contained, false or misleading information which lulled the Olles into waiving certain of their statutory rights including, but not limited to, the failure to advise

the Olles in writing that they had a period of time to rescind the Contract and receive in return the Deposit in full after the actual diminished size of the Unit was determined.

## COUNT IV
### *(Violation of DC Condominium Act)*

44.    The Olles incorporate herein by reference all of the allegations in paragraphs 1-29, 30-36, 38-40, and 42-43, as if restated in full.

45.    This pendent state law cause of action arises under DC Code § 42-1901 *et seq.*

46.    5401 Residential was obligated to register and to file with the Mayor a statement of material change in the information contained in the POS as it related to the size of the Unit, within 15 days after the Defendants or any one of them knew or should have known about the change.

47.    As a result of the foregoing failure to deliver the amendment, the POS given to the Olles was not current.

48.    5401 Residential was not entitled to sell, transfer or dispose of the Unit, nor forfeit the Olles' Deposit, unless and until there was delivered to them a current POS by the time of disposition or, in this case, forfeiture of the Deposit, which included an express disclosure

without qualification or condition of their absolute right of cancellation within 15 days after delivery of the current POS.

49.    5401 Residential is liable to the Olles for any false or misleading statement in a POS regarding the size of the Unit, and alleged above.

## COUNT V
### *(Violation of DC Consumer Protection Act)*

50.    The Olles incorporate herein by reference all of the allegations in paragraphs 1-29, 30-36, 38-40, and 45-49,  as if restated in full.

51.    This pendent state law cause of action arises under DC Code § 28-3901 *et seq.,* the District of Columbia Consumer Protection Act ("DCCPA").

52.    The Olles are persons and consumers under the DCCPA. 5401 Residential, and/or one or more of the other Defendants are merchants under the DCCPA.

53.    The sale of the Unit constitutes a real estate sale covered by the DCCPA.

54.    5401 Residential, and/or one or more of the other Defendants engaged in an act or acts which constitute a trade practice or trade practices under the DCCPA with respect to the sale of the Unit to the Olles.

55.    5401 Residential, and/or one or more of the other Defendants engaged in one or more unlawful trade practices as defined in § 28-3904 of the DCCPA, including but not limited to misrepresentations regarding the size of the Unit; and failed to provide information which would have protected their Deposit under other DC and federal laws which misled the Olles; and by making and enforcing unconscionable terms or provisions in the Unit sales contract.

### *Relief Requested*

Wherefore, the Olles pray for judgment, jointly and severally against the Defendants as the proof may show for:

A.    Rescission of the Contract, and/or

B.    Damages equal to the Deposit, and

C.    Damages equal to all interest that accrued on the Deposit prior to forfeiture by 5401 Residential, and

D.    Damages equal to the lost opportunity value of the Deposit from the date of forfeiture through the date of judgment; and

E.    Attorneys' fees and other litigation costs; and

F.    Such other and further relief as to the Court seems just and proper.

### *Jury Demand*

Plaintiffs request a trial by jury as to all issues so triable.

17

Respectfully submitted,

**FRIEDLANDER, MISLER, SLOAN, KLETZKIN & OCHSMAN, PLLC**

By: _____

Robert E. Greenberg, Esq. #173708
Thomas F. Murphy, Esq. #464475
1101 17th Street, NW
Suite 700
Washington, DC  20036-4704
(202) 872-0800

*Attorneys for Plaintiff*s

U:\greenberg\CLIENT\Olle\Litigation\Complaint 11-13-07.wpd

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

**I (a) PLAINTIFFS**   Laura N. Olle
Peter J. Olle

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___DC___
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS** 5401 Western Avenue Residential, LLC; 5401 Western PNH, LLC; PN Hoffman Realty, LLC and Lamont Hoffman

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___DC___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert E. Greenberg, Esq.
Friedlander Misler - 1101 17th St. NW, Ste. 700
Washington, DC 20036   (202) 872-0800

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

☐ **A.** *Antitrust*

☐ 410 Antitrust

☐ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☐ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

☒ **E.** *General Civil (Other)* OR ☐ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☒ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ G. *Habeas Corpus/ 2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 USC Sec. 1701 et seq. - Rescission under Interstate Land Sale Full Disclosure Act

## VII. REQUESTED IN COMPLAINT

CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23

DEMAND $ 259,906.00  Check YES only if demanded in complaint

JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY

(See instruction)  ☐ YES  ☒ NO  If yes, please complete related case form.

DATE  11/14/07  SIGNATURE OF ATTORNEY OF RECORD  *Robert E. Greenberg*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT. (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

I:\forms\js-44.wpd

Exhibit 1

## NON-BINDING RESERVATION AGREEMENT

For and in consideration of the sum of One hundred twelve thousand four ninety five ($ 112495 ) (the "Deposit"), receipt of which is hereby acknowledged, 5401 Western Avenue Residential LLC (the "Seller"), as the owner of the Condominium (as defined hereinafter), hereby grants to Peter and Laura Olle (the "Prospective Purchaser") the right to purchase the Condominium Unit identified as Unit No. PH 1 (the "Unit") in the condominium project to be known as The Chase Point Condominium (the "Condominium"), at a sales price of Two million two hundred forty nine thousand nine hundred ($ 2249900 ) (such sales price is exclusive of any purchase price for a parking or storage space, if applicable).

1.     In the event that either party hereto cancels this Reservation Agreement pursuant to Paragraph 2 below, the Deposit shall be returned immediately to the Prospective Purchaser.

2.     This Reservation Agreement may be canceled (a) by the Prospective Purchaser, at the sole option of the Prospective Purchaser, at any time before entering into a formal purchase contract for the Unit (the "Purchase Agreement"), by written notice of such cancellation to the Seller, or (b) by the Seller, by written notice, if the Prospective Purchaser does not enter into a formal purchase contract for the Unit within forty-eight (48) hours after written notice is sent to the Prospective Purchaser that the Purchase Agreement is prepared, or (c) by the Seller, or Prospective Purchaser, if the Prospective Purchaser has not, for any reason, signed a formal purchase contract for the Unit with the Seller within Seventy-five (75) days from the date hereof, or (d) by the Seller upon giving notice to the Prospective Purchaser of the Seller's intention to abandon its plan to construct the Condominium.

3.     This Reservation Agreement shall be void (a) in the event of cancellation according to the terms of Paragraph 2 above, or (b) at such time as the Prospective Purchaser and the Seller enter into a formal purchase contract for the sale of the Unit.  In the event that the Seller and the Prospective Purchaser enter into such contract, the Deposit given hereunder shall be credited toward any deposit required by such contract and the rights and obligations of the parties hereto shall be governed by the terms of such contract.  It is expressly agreed and understood between the parties hereto that the Prospective Purchaser is not obligated hereunder to purchase the Unit.

4.     All notices required or permitted to be given hereunder shall be in writing and delivered personally or by mail to the parties at the addresses indicated below.  This Reservation Agreement cannot be assigned by the Prospective Purchaser.

5.     Cooperative broker fee is not applicable to the purchase of the Unit.

NOTWITHSTANDING ANY PROVISION CONTAINED HEREIN TO THE CONTRARY, THE PROSPECTIVE PURCHASER ACKNOWLEDGES THAT THIS RESERVATION AGREEMENT IS NOT A CONTRACT, AGREEMENT OR BINDING OBLIGATION TO PURCHASE THE UNIT, AS SUCH MAY ONLY BE MADE IN ACCORDANCE WITH APPLICABLE LAW.

PROSPECTIVE PURCHASER:

_____ (SEAL)
Soc. Sec. # 322 46 5738
Date: _____

_____ (SEAL)
Soc. Sec. # 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
Date: _____

Address to which notices to the
Prospective Purchaser shall be sent:
4200 Military Rd, NW
Washington DC 20015
Phone # ( 202 ) 537 2918
Fax # ( 202 ) 537 2917
E-mail: Peterollo@aol.com

SELLER:

_____

By:    PN Hoffman, Inc., sales representative for Seller
       By: _____ 10/8/04
       Name: S. Mark Stahl
       Title: Vice President of Sales & Marketing

Address to which notices to the
Seller shall be sent:

PN Hoffman Sales & Design Center
4700 41st Street, N.W.
Washington, DC 20016
Dated: _____

**PLEASE MAKE CHECKS PAYABLE TO PN HOFFMAN ESCROW**



Exhibit 2



January 14, 2005


Peter & Laura Olle
4200 Military Road, NW
Washington DC 20015


Dear Peter & Laura:

Thank you again for purchasing your residence at Chase Point. It was a pleasure to assist you in this purchase. The Purchase Agreement has now been ratified by the Seller and enclosed is a fully executed copy of the Agreement for your records.

If you have any questions, please feel free to contact me at 202/966-2100, ext. 202.

Cordially,

David DeSantis
Sales Manager


Enclosure


**PN** HOFFMAN
Sales & Design Center

4700 41ˢᵗ Street NW, Washington DC 20016     (202) 966-2100     www.PNHOFFMAN.com

# CHASE POINT CONDOMINIUM
## CONDOMINIUM UNIT PURCHASE AGREEMENT

Title to be conveyed in the name(s) of:

Peter and Laura Olle

Unit No: PH1                                        Percentage Interest:  1.60%
L.C.E. Parking Space(s) No.:4 & 5
L.C.E. Storage Space No.: N/A

THIS CONDOMINIUM UNIT PURCHASE AGREEMENT (the "Agreement") is made between 5401 Western Avenue Residential, LLC, ("Seller"), and Peter and Laura Olle ("Purchaser").

Seller desires to sell and Purchaser desires to purchase Condominium Unit No: PH1 together with the exclusive right to use and occupy Limited Common Element Parking Space(s) Nos: 4 & 4, if applicable and/or Limited Common Element Storage Space No. N/A, in CHASE POINT CONDOMINIUM (the "Condominium"), located at 4301 Military Road, N.W., Washington, D.C.  20016.

Seller and Purchaser, for good and valuable consideration, agree as follows:

1. PURCHASE AND SALE OF UNIT.

    1.1  Seller agrees to sell to Purchaser, and Purchaser agrees to purchase, the Condominium Unit(s) identified in the Condominium Declaration as Unit Number PH1 (the "Unit"), together with the undivided interest in the Common Elements as set forth in the Declaration for the Condominium, and if applicable, the exclusive right to use and occupy the parking space(s) identified as Limited Common Element Parking Space Number(s) 4 & 5 (hereinafter, if applicable, collectively referred to as the "Parking Space"), and if applicable, the exclusive right to use and occupy the storage space identified as Limited Common Element Storage Space  Number N/A (hereinafter the "Storage Space").  The Unit's percentage interest in the Common Elements of the Condominium (the "Percentage Interest") as set forth in Exhibit B to the Condominium Declaration is 1.6%.  The Unit shall be conveyed "as is", except as otherwise set forth in the Limited Condominium Warranty attached hereto as Exhibit "F", and unfurnished.  Any furnishings and personal property displayed in any model unit or in any PN Hoffman, Inc. Sales and Design Center (the "Sales and Design Center") are not part of the Unit and are not included in the purchase price of the Unit. All illustrations, models, architectural renderings and unit features shown on any promotional or other materials provided to Purchaser, or exhibited in the Sales and Design Center, are for display or illustrative purposes only, and may not be representative of the Unit or the Condominium building features.  Additionally, any features of the Unit or Condominium building shown on any floor plans, marketing materials,

1



plats, plans, or any other promotional materials are subject to change by Seller in its discretion due to such factors as, but not limited to, building constraints, inspections and permitting approvals. Estimated dimensions or square footages shown in any floor plan sketches or provided in other related sales materials are approximations only, and Purchaser acknowledges that the Unit, Parking Space, and Storage Space are *not* being sold on a per square foot basis. The Parking Space and Storage Space are also being sold in an "as is" condition, and the Purchaser acknowledges that the Parking Space and Storage Space will be delivered unimproved, except as otherwise provided herein. All references herein to the "Unit" shall be deemed to include the Residential Unit (as defined in the Declaration, unless otherwise noted herein or the context indicates otherwise), and, as applicable, all Limited Common Elements to be assigned to the Residential Unit as provided herein.

2. PURCHASE PRICE AND TERMS OF PAYMENT.

2.1 The purchase price of the Unit, and the consideration for the assignment of the parking space 4, is Two Million Two Hundred Forty Nine Thousand Nine Hundred Dollars ($2,249,900). The consideration for the assignment of the additional parking space 5 is Forty Two Thousand Dollars ($42,000). The consideration for the assignment of the Storage Space, if applicable, is N/A. The total purchase price for the Unit and, if applicable, the consideration for the Parking Space and/or Storage Space (such total purchase price, exclusive of settlement costs, condominium fees, and prorated amounts of prepaid items, is collectively referred to as the "Total Purchase Price") shall be paid as follows:

(1) Initial Deposit upon signing this Agreement, to be applied as partial

   payment of the Total Purchase Price, receipt of which amount
   is hereby acknowledged                                                   $ 114,595

(2) Additional Deposit due on the date that is one (1) year after the date

   of this Agreement, but in no event later than June 30, 2006              $ 114,595

(3) (a.) ____ Proceeds of conventional loan. (b.) ____ All cash.    TBD

(4) Balance Due at time of Settlement, in cash or by
   certified or cashier's check.                                            TBD

   **Total Purchase Price**………………………………………….. **$2,291,900**

The Total Purchase Price may be subject to adjustments, including but not limited to, fees for additional Options (as defined hereinafter), as more fully set forth in Paragraph 15 of this Agreement, which adjustments shall be reflected in a Change Order Addendum, which is

2



attached as Exhibit "C" hereto. The Initial Deposit and the Additional Deposit are referred to herein collectively as the "Deposit".

2.2 Seller shall place Purchaser's Deposit in escrow in an interest-bearing escrow account in a bank or savings and loan association in an escrow account pursuant to Section 42-1904.09 of the Condominium Act. The Deposit shall be credited to Purchaser at Settlement (as defined in Paragraph 7) and the Total Purchase Price shall be paid to Seller by certified or cashier's check at Settlement. The term "Deposit" includes any interest earned on any deposit made by the Purchaser under this Agreement. The Deposit shall not be deemed to include any amounts paid for Options.

2.3 The Deposit shall be disbursed upon the following terms: (a) if Settlement is made, the Deposit will be delivered to Seller at the time of Settlement, or (b) if Settlement is not made as provided herein because of Purchaser's default or failure to comply with any term of this Agreement, Purchaser shall forfeit the Deposit and any other amounts paid under this Agreement, including any amounts paid for Options, which may be retained by Seller as liquidated damages.

3. FINANCING

Purchaser hereby elects the following method of financing, pursuant to the terms of this Agreement:

(Check One)

_____ No financing arrangement (all cash)

___X___ Financing arranged through lender of Purchaser's choice

_____ Financing arranged through Seller's designated lender (a "Designated Lender")

Irrespective of whether Purchaser elects to pursue financing through a lender or pay all cash at Settlement, Purchaser must submit a written pre-approval letter from a lender prior to ratification of this Agreement.

3.1 Cash or Purchaser's Lender. Regardless of whether Purchaser elects to pay the Total Purchase Price all in cash, or whether Purchaser elects to place a mortgage or deed of trust on the Unit with a lender of Purchaser's choice or a Designated Lender, this Agreement shall be in no way contingent upon Purchaser obtaining financing, and Purchaser assumes full responsibility to initiate and pursue all steps necessary to obtain the funds required for Settlement. Further, Purchaser shall provide Seller, within ten (10) days after any request therefore, proof of Purchaser's financial ability to pay the Total Purchase Price at Settlement. If Purchaser fails to provide proof reasonably satisfactory to Seller, Seller at its sole option, may terminate this Agreement and retain the Deposit, and any amounts paid for Options. **The**

3



Purchaser acknowledges that the purchase of the Unit is in no way contingent on Purchaser's ability to obtain financing for its proposed purchase of the Unit, whether from a lender of Purchaser's choice, or a Designated Lender.

       3.2 <u>Designated Lender</u>.  If Purchaser elects to obtain financing from a Designated Lender, then Purchaser shall, in addition to obtaining a pre-approval letter from the Designated Lender, make prompt, diligent and truthful application to the Designated Lender no later than fifteen (15) days after the  expiration of Purchaser's right to cancel, as set forth in Paragraph 26 below.  Purchaser shall complete all mortgage credit applications and other similar forms provided by the Designated Lender promptly after receipt, and if such forms are not submitted to the Designated Lender properly and fully executed within fifteen (15) days after the request for the same, then this Agreement, at the sole option of Seller, *may* be terminated and the Deposit retained by Seller. Purchaser shall comply with the terms of any commitment from the Designated Lender.

       In the event that the Designated Lender finances the purchase of the Unit and Purchaser selects the settlement company set forth in Paragraph 7.1 below, Seller will credit Purchaser an amount equal to 50 basis points of Purchaser's first trust loan amount, not to exceed Five Thousand Dollars ($5,000.00) towards closing costs at Settlement and Purchaser will pay all other settlement costs and lender's fees. In the event that Purchaser elects to obtain financing from a lender of Purchaser's choice, or in the event that Purchaser selects its own settlement company to conduct settlement, Purchaser shall pay all settlement costs and lender's fees including without limitation the loan origination fee, loan discount fee, appraiser, inspection and credit report fees, and Seller shall not be obligated to pay any fees charged by a lender or Purchaser's settlement company.

       Purchaser's credit will be subject to approval by the Designated Lender making such mortgage loan, and Seller will have no liability or responsibility in the event Purchaser is unable to obtain the financing required for Settlement from the Designated Lender.

       PURCHASER HEREBY ACKNOWLEDGES THAT THIS AGREEMENT SHALL IN NO WAY BE CONTINGENT UPON FINANCING, AND IRRESPECTIVE OF WHETHER A DESIGNATED LENDER OR A LENDER OF PURCHASER'S CHOOSING IS UTILIZED, PURCHASER ASSUMES FULL RESPONSIBLILTY TO INITIATE AND PURSUE ALL STEPS NECESSARY TO OBTAIN THE FUNDS REQUIRED FOR SETTLEMENT. PURCHASER HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT CONTINGENT UPON THE SALE OR RENTAL OF PURCHASER'S PRESENT HOME, IF ANY, OR ANY OTHER PROPERTY, AND THAT ANY CONTINGENCY A LENDER MAY SET FORTH IN A PREAPPROVAL LETTER IS A CONTINGENCY SOLELY PLACED ON PURCHASER.

Purchaser promptly shall advise Seller in writing of any material change in Purchaser's financial condition.

4. UNIT OWNERS ASSOCIATION.

4.1 A condominium unit owners association (the "Association") will be established for the purpose of operating and maintaining the Condominium. Each owner of a unit in the Condominium automatically will be a member of the Association and will be subject to the Declaration, the Bylaws and the Condominium Rules and Regulations. The voting rights of each unit owner are set forth in the Declaration and the Bylaws. The affairs of the Association will be conducted by a Board of Directors, as set forth in the Bylaws. The initial Board of Directors will be appointed by the Seller. Not later than the time that units to which twenty-five percent (25%) of the Percentage Interests in the Common Elements (as defined in the Declaration for the Condominium) appertain have been conveyed, a special meeting of the Association shall be held at which not less than twenty-five percent (25%) of the members of the Board of Directors shall be elected by unit owners (other than the Declarant), who shall serve until the date of the first annual meeting of the Association. Not later than the time that units to which fifty percent (50%) of the Percentage Interests in the Common Elements appertain have been conveyed, a special meeting of the Association shall be held at which not less than thirty-three and one-third percent (33-1/3%) of the members of the Board of Directors shall be elected by unit owners (other than the Declarant) who shall serve until the date of the first annual meeting of the Association. The first annual meeting of the Association shall be held at a time and place to be designated by the Board of Directors: (i) within two (2) years from the date that the first unit is conveyed, or (ii) within ninety (90) days after units to which seventy-five percent (75%) of the Percentage Interests in the Common Elements appertain have been conveyed, whichever date first occurs, or (iii) on such earlier date as may be established by the Board of Directors. The total number of Directors after control is turned over will be five (5). The procedures for election of the Directors is set forth in Bylaws which are an Exhibit to the Public Offering Statement.

5. CONDOMINIUM ASSESSMENTS.

5.1 Purchaser is obligated and agrees to pay monthly his or her Unit's Percentage Interest of the Common Expenses of the Condominium, as set forth in the Declaration. Seller's estimate of the monthly Condominium fee is $1,052.13 for the Unit. Additionally, each owner of each Limited Common Element Parking Space will be charged initially a monthly fee of $25.00, and each owner of a Limited Common Element Storage Space will be charged initially a monthly fee of $15.00, such fees being subject to the same annual increases as the Condominium fees for the Units. The aforementioned fees are only estimates and are not guaranteed by Seller.

5



6. CONVEYANCE OF TITLE.

6.1  At Settlement, Seller shall convey to Purchaser good and merchantable title to the Unit (together with the Unit's respective undivided Percentage Interest in the Common Elements) by special warranty deed, subject only to the general real estate taxes and water and sewer assessments for the current tax year not then due; the Condominium Act of 1976 Technical and Clarifying Amendment Act of 1992 as the same may be amended, the Declaration, Bylaws, Plat and Plans and Rules and Regulations of the Condominium; easements, covenants and conditions of record; ordinances and regulations of competent municipal or other governmental authorities; the Zoning Order (defined in Paragraph 33.1 below); easements for sewers, water, gas, fuel line, drainage, electric, telephone and other similar utilities, if any, granted or to be granted; and Purchaser's deed of trust, if any.  Purchaser shall, upon request, execute any instruments creating or consenting to such covenants, conditions, easements, or restrictions.  At the time of Settlement, Seller will also cause the Parking Space and Storage Space, if applicable, to be assigned to the Unit being purchased as a Limited Common Element.

6.2  In the event that, upon examination, the title should be found defective and the defects are of such character that they may be remedied within a reasonable time by legal action to perfect the title, such action must be taken promptly by and at Seller's reasonable expense, whereupon the time herein specified for full settlement by the Purchaser will thereby be extended for the period necessary for such action.  If Seller is unable to perfect title as specified herein, then Seller may terminate this Agreement and cause the Deposit and any advance for Options to be returned to Purchaser.  In such case, Seller is expressly released from all other liability for damages arising from such event, and in no event shall Seller be liable for any damages for defects in title.  If Seller chooses to terminate this Agreement and return the Deposit and advance payments for Options to Purchaser pursuant to this Paragraph, then all rights and liabilities of the parties under this Agreement shall forthwith terminate.

**6.3  Purchaser is advised that, as of the date hereof, Seller does not own legal title to all of the land intended to comprise the Condominium, but rather, Seller is the owner of a portion of such land and is the contract purchaser of the remainder of such land.  In the event that Seller, for any reason, has not acquired legal title to all of the land intended to comprise the Condominium by June 1, 2005, then either Seller or Purchase shall have the right to terminate this Agreement.  In the event of a termination under this Paragraph 6.3, all deposits shall be returned to Purchaser and the parties shall have no further liability to one another.**

7. SETTLEMENT.

7.1  Settlement on the purchase and sale of the Unit (the "Settlement") shall occur on a date specified by a written notice from Seller to Purchaser stating that the Unit will be ready for conveyance by Seller (subject to completion of punch list items as set forth below in

6



Paragraph 9.1) on the specified date, which date will be no earlier than ten (10) days from the date of the notice. Purchaser shall complete Settlement on the date specified by Seller. Purchaser shall be responsible for ensuring that Settlement occurs on the date specified, and if Settlement is delayed due to Purchaser or Purchaser's lender (or the settlement company selected by Purchaser), then Purchaser shall pay to Seller at Settlement $165.00 for each day that Settlement is delayed beyond the specified date. At Settlement, Purchaser shall pay the Total Purchase Price for the Unit and, upon receipt thereof, Seller shall deliver the deed for the Unit. Purchaser shall be entitled to occupy and have possession of the Unit from and after Settlement. Purchaser shall pay at Settlement all settlement costs not previously paid, including, without limitation, credit report fee, lender's appraisal fee, District of Columbia Real Property Recordation Tax (1.1%), document recordation charges, fees for title examination, preparation of all documents of conveyancing and all mortgage instruments, settlement fees, notary fees, and fees for mortgagee's title insurance, private mortgage insurance premiums, if any, any loan origination, discount or similar fees, and fees for owners title insurance (if obtained) and other charges in the nature of prepaid expenses, escrows for taxes and the like. Purchaser shall also pay all Condominium assessments and initial capital contribution, as set forth in Paragraphs 5 and 7.2 respectively, due at Settlement. Seller will pay the D.C. Transfer Tax (1.1%) and, if both the settlement company and the mortgage lender (including the loan officer listed below) identified below is selected for Settlement, Seller will credit Purchaser an amount equal to 50 basis points of Purchaser's first trust loan amount, not to exceed Five Thousand Dollars ($5,000.00), towards the settlement charges otherwise chargeable to Purchaser:

> Settlement Attorney:
> Lane Potkin, Esquire
> Leibner & Potkin, P.C.
> 4725 Wisconsin Avenue, NW, Suite 250
> Washington, DC 20016
>
> Seller's Designated Lenders:
> First Savings Mortgage Corporation
> 10401 Connecticut Avenue, Suite 103
> Kensington, Maryland 20895
> Contact: Renee Schuster Voyta, VP
>
> Wells Fargo
> 12701 Fair Lakes Circle, Suite 275
> Fairfax, VA 22033
> Contact: Scott Hawkins, Consultant
>
> National City Mortgage
> 6110 Executive Blvd, #250
> Rockville, MD 20852
> Contact: Leonard Gordon, Branch Manager

In the event that Purchaser decides to select either a settlement company, lender, loan officer for Designated Lender other than as indicated above, Purchaser shall not be entitled to the payment of settlement charges by Seller as set forth above. Purchaser shall notify Seller in writing not

less than sixty (60) days prior to the projected date of Settlement of its selection of settlement company or settlement attorney. If no such notice is given to Seller within the aforementioned time period, then Seller may designate the title attorney or title company to conduct Settlement.

7.2 Purchaser shall pay at Settlement as an initial capital contribution to the Condominium, an amount equal to two times (2x) the "Estimated Monthly Assessment" (Condominium fee) for the Unit as set forth in Exhibit V-B of the Public Offering Statement. This initial capital contribution will be allocated to the Condominium's working capital. This initial capital contribution is in addition to, and not in lieu of, the regular monthly Condominium fee, which will be prorated at Settlement, and is nonrefundable.

7.3 Purchaser hereby acknowledges that any information given to Purchaser by Seller, or any sales representative, employee, or agent of Seller with respect to anticipated dates for the delivery of title and possession of the Unit is not to be considered a material part of this Agreement or a material representation or warranty by Seller.

7.4 (a) If Settlement shall not have occurred within twenty-four (24) months after the execution of this Agreement by Purchaser, due to reasons within Seller's control, Purchaser's sole remedies shall be either:

   (i)     terminating this Agreement by written notice to Seller, delivered at any time prior to Seller's establishment of a settlement date as provided in Section 7.1 of this Agreement, in which event Seller shall, if Purchaser shall not then be in default, cause the Deposit and all other payments made by Purchaser to Seller hereunder, if any, to be returned to Purchaser, and neither party shall have any further liability or obligation hereunder; or

   (ii)    electing to proceed with the purchase of the Unit when the Unit is completed.

The remedies specified herein shall be the sole and exclusive remedies of the Purchaser in the event of any default by Seller, it being expressly agreed and understood that Purchaser hereby waives any claims against Seller for any monetary or consequential damages of any kind.

(b) Seller shall use reasonable efforts to complete construction of the Unit, and Settlement on such Unit shall occur when Seller is legally permitted to convey the Unit, within twenty-four (24) months after execution of this Agreement by Purchaser; provided, however, that if Seller is delayed in the performance of the aforesaid obligation for reasons beyond the control of Seller, then the time for performance of Seller's obligation shall be extended for a reasonable period of time, and such delay shall not be considered a breach of this Agreement, provided that in no event shall Settlement be extended to a date more than thirty-six (36) months after execution of this Agreement by Purchaser. Reasons beyond the control of Seller shall include, without limitation, impossibility of performance, acts of God, fire, earthquake, flood, explosion,

terrorism, condemnation, or acts of governmental agencies asserting jurisdiction over the Condominium or the Property, and any other legally supportable justification under the laws of the District of Columbia, which would excuse Seller from completing the Unit within such twenty-four (24)-month period. Notwithstanding anything to the contrary in this Agreement, if Settlement does not occur due to reasons set forth in this Paragraph, then Seller's sole obligation to Purchaser shall be to cause the Deposit and fees paid for Options to be returned to Purchaser.

8. SETTLEMENT ADJUSTMENTS.

8.1 All monthly condominium assessments for the month in which Settlement is made, if any, real property taxes, insurance premiums, any assessments of water, sewer, or similar services to the Condominium, and any other prepaid or pro-ratable items shall be prorated between Purchaser and Seller as of the date upon which Seller is prepared to close according to the terms of this Agreement. Thereafter, each of these items shall be assumed and paid by Purchaser. In the event that at time of Settlement any such item has not been allocated among the units the total of such items for the Condominium shall be allocated among the units (on an estimated basis, if necessary) in accordance with each unit's Percentage Interest as set forth in the Declaration.

9. INSPECTIONS.

9.1 Pre-Settlement Inspection. Seller shall notify Purchaser not less than ten (10) days prior to Settlement of the date and time that the Unit will be ready for inspection. Upon receipt of such notice, Purchaser shall promptly arrange for an appointment with a representative of Seller to make the pre-settlement inspection. At such inspection, the Pre-Settlement Inspection Form (the "Report") set forth as an exhibit hereto shall be completed and executed by Purchaser and by a representative of Seller. Purchaser shall attend such inspection and participate in completing the Report prior to Settlement. Seller shall complete, install or repair (as the case may be) any such "punch list" items noted on the Report within a reasonable time, but in no event shall the existence of any such items be a bar to Settlement or a ground to postpone Settlement beyond the time otherwise appointed in accordance with the terms of this Agreement. At Settlement, no escrows for such items shall be established for any reason or under any circumstance whatsoever. Failure of Purchaser to arrange for a pre-settlement inspection within the aforementioned ten (10) day period or failure of Purchaser to keep the inspection appointment shall constitute full acceptance of the Unit by Purchaser. Upon acceptance of the deed by the Purchaser, Purchaser agrees to hold Seller free from liability for any visible defects not specifically noted in the Report; provided the terms detailed in the "Limited Condominium Warranty" will govern the limit of Seller's responsibility with respect to items covered by such warranty. After Settlement, Purchaser is responsible to allow adequate access to the Unit for Seller to remedy items noted on the Report during normal working hours and as mutually agreeable. The Report is Purchaser's warranty by Seller that any incomplete work will be done as promptly as materials, weather and workload permit.

9



9.2 <u>Move-in / Move-out Policy.</u> The Purchaser shall abide by the move-in / move-out policy for the Condominium as referenced in the Bylaws, and in accordance with the move-in schedule established by Seller. The Purchaser shall be responsible for any damage to the common areas of the Condominium building (including the elevators and hallways) and to the Unit resulting from the initial move-in after Settlement (whether by Purchaser, its invitees or tenants). A move-in fee of $200.00 shall be payable for all move-ins, including the initial move-ins by the first occupants of the Unit (which shall be collected at Settlement).

10. WARRANTY.

10.1 At Settlement, Seller shall deliver to Purchaser an executed warranty in the form set forth in the "Limited Condominium Warranty" attached hereto as Exhibit "F". Seller reserves the right at its option and at any time (either before or after the sale of a unit) to grant additional warranties with respect to any unit or the common elements.

11. RISKS.

11.1 The risk of loss or damage to the Unit by fire or other casualty is assumed by Seller until the time of Settlement. If such loss or damage occurs, Seller may terminate this Agreement and refund the Deposit and any advance paid for Options to Purchaser hereunder without further liability or obligation to Purchaser. Purchaser shall have no right or claim to fire or other casualty insurance proceeds.

12. DEFAULT, SUBORDINATION, MERGER AND ASSIGNMENT.

12.1 If Purchaser shall default in any of the payments or other obligations called for in this Agreement, and fails to cure such default within the ten (10) days after written notice from Seller, then at the option of Seller, Purchaser shall forfeit any and all rights under this Agreement, and any amount theretofore paid under the terms of this Agreement may be retained by Seller as liquidated damages. If for any reason whatsoever Seller shall be unable to deliver title in accordance with the provisions of this Agreement, Seller's liability shall be limited to the return of any payments made by Purchaser hereunder.

12.2 Purchaser's interest in this Agreement shall be subordinate to any lien placed by Seller against the Unit or the Condominium at any time prior to Settlement. Purchaser agrees to execute such further assurances of this covenant as may be required from time to time by Seller. Seller shall cause any such lien against the Unit to be released at or prior to Settlement, to the extent required by Paragraph 6 of this Agreement.

12.3 This Agreement shall be binding upon the parties hereto, and, as applicable, each of their respective heirs, personal representatives and successors.

10



12.4  This Agreement is personal to Purchaser and is not assignable by Purchaser either voluntarily, by operation of law, or otherwise.  Seller may assign its rights hereunder in Seller's sole discretion.

13.  URBAN CONDITIONS.

13.1  Purchaser is purchasing the Unit subject to, and accepts all the risks associated with, conditions related to urban environments including, but not limited, to noise created by adjacent neighbors/property owners, bars, restaurants, nightclubs, construction, general street traffic, emergency vehicles, aircraft, general airport noise, noise and vibrations common in multi-dwelling buildings (from equipment such as, including but not limited to, exhaust fans and air condenser units) and other noise common in urban settings; common urban pests; vibrations from large vehicles such as trash trucks, buses, metrorail trains and street cleaning equipment; smells including trash and other smells from adjacent properties or other units in a multi-dwelling building, and, future development of surrounding property that may impact including, but not limited to, the light and air of the Unit.

14.  SPECIFICATIONS.

14.1  Specifications for the Unit are listed and included with this Agreement as Exhibit "A" hereto (the "Specifications").  These Specifications include the appliances, finishes, and the general characteristics of the Unit.  Seller reserves the right to substitute manufactured items or products in the Unit should sources become unavailable.

14.2  A conceptual sketch of the Unit is shown on Exhibit "B" attached hereto. This sketch generally delineates the rooms and layout of the Unit.  The sketch is conceptual in nature and is not intended to be scaled for room dimensions.  Final build-out of walls, ceilings, kitchen, baths, bedrooms, and specific features and details of the Unit may vary from the conceptual sketch due to construction constraints beyond the Seller's control or actual knowledge and Purchaser shall hold Seller harmless for such constraints on the final build-out of the Unit.

14.3  Furniture, wallcoverings, furnishings or the like as shown in or about any model unit, sales materials, renderings, or the Sales and Design Center are for display purposes only and are not considered a part of the Unit for the purposes of this Agreement. Further, the location of wall switches, thermostats, chases, exposed ductwork, exposed sprinkler lines and heads, vents, exposed plumbing lines, plumbing, electrical outlets, fireplaces (if applicable), and similar items may vary from unit to unit and may not be as shown in any model unit and any marketing materials. Any floor plans, sketches or sales drawings shown to Purchaser are for general illustrative purposes only and may not be in accordance with the final build-out of the Unit. The Unit is being sold unfurnished and will contain only the appliances and equipment installed at the time of inspection of the Unit by Purchaser, unless otherwise noted (including the appliances and equipment set forth in the Specifications).  Seller will finish and equip the Unit

11

only in accordance with the Specifications and Special Amenities List for the Unit. Any scale model of the Unit or Condominium is only an artist's conception and is subject to change.

14.4  Due to continuing changes in products, building codes and availability of materials, the Seller reserves the right to incorporate new design features or equivalent materials at any time without notice. Additionally, variations (such as color) occurring in Units or Common Areas of building materials and finishes, such as tile, granite, carpeting in Common Areas are not considered defects and will not be replaced by the Seller if variation occurs. This provision shall survive Settlement.

14.5  As of the date of this Agreement, the building permit for the Condominium building may not have been issued by the District of Columbia. Although construction documents customary in the development industry have been submitted, the District may require changes to those documents, and if that is the case, then Seller reserves the right to incorporate such changes and modify the size, configuration, and/or other features of the Unit accordingly, provided such changes do not materially and adversely affect Purchaser's use of the Unit.

15.  UNIT OPTIONS.

15.1  In the event that Seller offers certain Option or Upgrades for the Unit, Purchaser may select from a list of options and upgrades offered by Seller (collectively the "Options"). The additional costs of the Options will be set forth in the materials provided to Purchaser, and are not otherwise set forth in the exhibits to this Agreement.

15.2  If Options are purchased from Seller, Purchaser shall pay Seller for one half (1/2) of the costs of the Options ("Options Deposit") upon execution of a Change Order Addendum (in the form attached hereto as Exhibit "C"). Purchaser hereby acknowledges that the Options Deposit is transferred directly into the Seller's operating account in order to carry out the implementation and installation of the Options. The balance due for the Options shall be payable at Settlement. Purchaser acknowledges the Options Deposit shall be non-refundable. Accordingly, if Settlement does not occur for any reason other than Seller's default, including, but not limited to, Purchaser's inability to obtain financing or lack of funds to close, Purchaser will forfeit the Options Deposit made to Seller under this Agreement, in addition to any other remedies that Seller may have.

16.  DISTRICT OF COLUMBIA SOIL DISCLOSURE REQUIREMENT.

16.1  Purchaser confirms that Seller has advised it, pursuant to Title 45, Section 308 of the District of Columbia Code, that the soil on the subject property on which the Condominium is located is noted in the Soil Survey of the District of Columbia as Coastal Plain Geologic Province of Mid-Atlantic States (Wicomico Formation). Purchaser has been advised that it may obtain further information in this regard by engaging a soil testing laboratory, the D.C. Department of Environmental Services, or the Soil Conservation Service of the U.S.



Department of Agriculture. Nothing herein shall constitute a representation or warranty by Seller as to the soil characteristics of the subject property on which the Condominium is located.

17. UNDERGROUND STORAGE TANKS.

17.1 In accordance with the requirements of the D.C. Underground Storage Tank Management Act of 1990 as amended by the District of Columbia Underground Storage Tank Management Act of 1990 Amendment Act of 1992 (D.C. Code 6-995.1 et seq.) (the "Act") and the D.C. Underground Storage Tank Regulations, 20 DCMR Chapters 55-68 (the "Regulations"), Seller hereby informs Purchaser that Seller has no knowledge of the existence of an "underground storage tank" as that term is defined in the Act and the Regulations. Seller shall provide an Underground Storage Tank Real Estate Transfer Disclosure Form at Settlement.

18. NOTICES.

18.1 All notices and demands required or given pursuant to the terms of this Agreement shall be in writing and served by certified mail or personal delivery (including overnight courier) at the address of the Purchaser indicated below, or if to Seller:  5401 Western Avenue Residential, LLC. 4725 Wisconsin Avenue, NW, Suite 200, Washington, DC 20016.

19. DESIGNATIONS AND CAPTIONS.

19.1 In any designation hereunder, reference to the masculine gender shall be deemed to included the feminine gender wherever same may be appropriate, and the plural shall be substituted for the singular or the singular substituted for the plural in any place herein in which the context may require substitution.

19.2 The captions contained in this Agreement are for convenience only and are not to be considered a material part hereof, and are not intended in any way to limit or enlarge the terms or provisions of this Agreement.

20. INITIAL OPERATING PERIOD.

20.1 During the "Initial Operating Period", at Seller's election (i) the Seller (as Declarant of the Condominium) shall pay the costs of operating the Condominium and (ii) each Unit Owner, in lieu of an assessment against the units for Common Expenses, shall pay to Seller a fee in an amount equal to 90% of the units' estimated monthly condominium fee for each month (or portion of a month on a pro rata basis) during the Initial Operating Period that the unit owner owns a unit. The Seller shall not be obligated to fund or otherwise contribute to any capital or other reserve fund for the Condominium during the Initial Operating Period. "Initial Operating Period," as defined in the Bylaws, means the period of time commencing on the date that the Condominium is created and ending on the date which is ninety (90) days after units to which 75% of the Percentage Interests appertain have been conveyed by Seller or, if sooner, two

13



(2) years from the conveyance of the first unit, or on such earlier date as the Seller, in its sole discretion, may determine.

21.  AGREEMENT EXPRESSES ENTIRE UNDERSTANDING.

21.1  This Agreement together with the "Financial Information Sheet" completed by Purchaser and delivered to Seller constitute the entire agreement between the parties.  No representations, warranties, undertakings, promises, claims, advertising or promotional activities, made or conducted by Seller, or Seller's agents or sales representatives, whether oral, implied or otherwise, shall be binding upon Seller unless the same are expressly set forth in this Agreement or in a subsequent written agreement executed by Seller.  All amendments, supplements or riders hereto, if any, shall be in writing and executed by both parties.

21.2  No representations or agreements with respect to modifications or changes in the Unit or Options required or requested by Purchaser, will be recognized unless such representations or agreements are in writing, signed by the parties hereto, and any required payments for such modifications, changes or Options are made at the time of the execution of such writing.

21.3  Unless oral statements or promises are reduced to writing and included in this Agreement, such statements or promises may not be enforceable under law.  By including the terms below, Purchaser and Seller are making them a part of this Agreement.  THIS PARAGRAPH SHOULD NOT BE LEFT BLANK IF YOU ARE RELYING ON ANY ORAL STATEMENTS OR PROMISES.

The following oral statements or promises have been made by Seller, Seller's agent, sales representatives, or Purchaser.  Performance of each of these statements or promises is incorporated into each party's obligation to fully perform the terms of this Agreement:



22.  COUNTERPARTS.

22.1  This Agreement may be executed in multiple counterparts, each of which, when so executed and taken together, may be considered an original.

23.  TIME OF ESSENCE.

23.1  Time shall be considered of the essence in this Agreement.

14



24.  RECEIPT OF PUBLIC OFFERING STATEMENT.

24.1  Purchaser hereby acknowledges that s/he has received a copy of the Public Offering Statement, and exhibits thereto, for CHASE POINT CONDOMINIUM (the "Public Offering Statement").  Purchaser hereby ratifies and agrees to be bound by the provisions of the foregoing documents, as each such document may be duly amended from time to time.

25.  ACCESS TO UNIT PRIOR TO SETTLEMENT.

25.1  In order to comply with insurance requirements and to assure the safety of Purchaser and Seller's personnel, Purchaser shall not have access or entry to the Unit, the Condominium building or the property on which the Condominium building is being constructed (the "Construction Site") during construction, nor may Purchaser store any of its possessions in or about the Unit or the Construction Site prior to Settlement of the Unit and delivery of possession to Purchaser hereunder.  **PURCHASER ACKNOWLEDGES AND AGREES THAT ENTRY INTO THE UNIT OR THE CONSTRUCTION SITE WITH OR WITHOUT SELLER'S PERMISSION OR ACCOMPANIED OR UNACCOMPANIED BY SELLER'S SALES REPRESENTATIVES OR PERSONNEL, SHALL BE AT PURCHASER'S, ITS AGENTS', GUESTS', CONTRACTORS', INSPECTORS' AND INVITEES' SOLE AND EXCLUSIVE RISK AND PURCHASER HEREBY WAIVES ANY AND ALL CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE INCURRED BY PURCHASER, ON OR ABOUT THE UNIT OR CONSTRUCTION SITE WHETHER CAUSED BY SELLER, ITS REPRESENTATIVES OR PERSONNEL. PURCHASER FURTHER COVENANTS AND AGREES TO INDEMNIFY, DEFEND AND SAVE SELLER AND ITS REPRESENTATIVES AND PERSONNEL HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE BROUGHT BY PURCHASER, OR ITS AGENTS, GUESTS, CONTRACTORS, INSPECTORS OR INVITEES.**  Unauthorized access to the Unit or Construction Site shall be considered a trespass which may, at the election of Seller, be considered a material breach of this Agreement, and in addition to any other remedies available to Seller, Seller may declare this Agreement void, and, in such event, the Deposit herein provided, plus any amounts paid on account for Options, may be retained by Seller as fixed liquidated damages.

_____ / _____ [Purchaser's initials]

25.2  Purchaser shall have three (3) opportunities to view the Unit prior to Settlement:  (1) at the orientation walkthrough to be scheduled by Seller prior to completion of the Unit, (2) at the pre-settlement inspection as set forth in Paragraph 9 herein upon substantial completion of the Unit, and (3) if necessary, one follow-up visit to the Unit following the pre-settlement inspection, but prior to Settlement on the Unit.  Purchaser hereby acknowledges that no other access or entry into the Unit will be granted to Purchaser other than as set forth under

15



this Paragraph 25.2. Purchaser has read this Paragraph 25.2 and agrees to adhere to the terms of Paragraph 25 hereof.

_____ / _____ [Purchaser's initials]

26. PURCHASER'S RIGHT TO CANCEL.

     26.1  Seller hereby grants to Purchaser a period of fifteen (15 ) days within which to review the Public Offering Statement made available to Purchaser pursuant to the District of Columbia Condominium Act of 1976 Technical and Clarifying Amendment Act of 1992 and applicable regulations.  Notwithstanding any other provision of this Agreement to the contrary, Purchaser, at his or her election, by written notice to the Seller or Seller's agent, sent by registered mail (or personal delivery to the Seller's or Seller's agent's office during business hours) at any time prior to midnight local time of the fifteenth (15th) day following the date this Agreement is accepted by the Seller, or receipt by Purchaser of a current Public Offering Statement, whichever is later, may terminate this Agreement, and thereupon the Purchaser's entire Deposit shall be refunded and the parties hereto shall have no further rights or liabilities under this Agreement.

     26.2  Purchaser's Right to Cancel. [Spanish equivalent]

     El vendedor permitirá al comprador un periodo de 15 días para revisar los documentos referentes a las leyes y regulaciones del Distrito de Columbia.  No obstante cualquier otra provisión de este acuerdo, el comprador, podrá a su elección, responder al vendedor por medio de una carta registrada (o entregarlo personal mente a la oficina del vendedor durante las horas del trabajo) en ecualquer momento antes de la medianoche del decimoquinto día que sigue la fecha señalada en el contrato firmado por el comprado, o, que el comprado haya recibido un Anuncio de Oferta Publica corriente, lo que suceda últimamente, podrá terminar el acuerdo, el comprador recibirá su deposito y no habrá ninguna obligación entre las personas dentro de esta acuerdo.

     26.3  If Purchaser terminates this Agreement pursuant to Paragraph 26 herein, Purchaser shall return to Seller all copies of the Public Offering Statement and exhibits thereto, or pay to Seller the sum of $50.00 at such time, and the parties hereto shall execute a release of this Agreement.

     27. AGENCY.  CHECK IF APPLICABLE ☐

     The Seller agrees to pay to Purchaser's real estate salesperson (the "Agent") (if applicable), a commission in the amount as outlined in the "PN Hoffman Sales and Design Center Broker Registration" (the "Registration Form") attached as Exhibit D hereto, and distributed in accordance with the terms and conditions as set forth therein.  At Settlement on the

16



Unit, said commission is hereby assigned to the Broker as set forth on the Registration Form out of the proceeds of the sale of the Unit, and the settlement company is hereby authorized and directed to deduct the aforesaid commission from the proceeds of the sale and to make payment thereof directly to the Broker in accordance with a fully executed Registration Form. In the event that that an Agent or Broker is not identified in the Registration Form, or the Registration Form is not fully executed, Purchaser shall indemnify Seller against the claim of any other broker, salesperson or sales agent claiming through Purchaser, including any attorney's fees incurred as a result of such claim. In the event that Settlement on the Unit does not occur for any reason, Agent shall not be entitled to any commission and Purchaser shall indemnify Seller against any claim that the Agent may have to such commission, including attorney's fees incurred as a result of such claim.

28. PRIMARY RESIDENCE.

PURCHASER HEREBY REPRESENTS AND WARRANTS THAT PURCHASER INTENDS TO OCCUPY THE CONDOMINIUM UNIT AS A PRIMARY RESIDENCE. ANY MISREPRESENTATION REGARDING PURCHASER'S INTENTION TO RESIDE IN THE CONDOMINIUM UNIT SHALL CONSTITUTE A DEFAULT BY PURCHASER PURSUANT TO PARAGRAPH 12 OF THIS AGREEMENT AND SHALL RESULT IN FORFEITURE OF PURCHASER'S DEPOSIT.

_____ / _____ [Purchaser's initials]

29. ARBITRATION.

ANY DISPUTE, CONTROVERSY, OR CLAIM CONCERNING THE RIGHTS OR OBLIGATIONS OF THE PARTIES, INCLUDING, WITHOUT LIMITATION, ANY CONDITION OR ELEMENT OF THE UNIT, NEIGHBORHOOD OR NEARBY PROPERTY; THE NEED OR EFFECTIVENESS OF ANY REPAIR OR REPLACEMENT UNDER THE LIMITED WARRANTY; OR ANY CLAIM OR MISREPRESENTATION, FRAUD, OR BREACH OF THIS AGREEMENT, SHALL BE SUBMITTED TO AND SETTLED BY BINDING ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT, TITLE 9 U.S.C. SELLER AND PURCHASER AGREE THAT SUCH ARBITRATION SHALL BE MANDATORY AND BINDING AND SHALL BE IN LIEU OF ANY OTHER LEGAL PROCESS OR REMEDY. ARBITRATION MAY BE REQUESTED BY EITHER PARTY AND SHALL BE CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION ACCORDING TO ITS COMMERCIAL RULES. THE ARBITRATION SHALL AWARD ATTORNEY'S FEES, EXPERT WITNESS FEES, AND REASONABLE COSTS TO THE PARTY WHOSE POSITION IS UPHELD BY THE ARBITRATOR. SHOULD PURCHASER, IN VIOLATION OF THIS SECTION 29, COMMENCE LEGAL ACTION IN A COURT, SELLER SHALL HAVE THE RIGHT TO HAVE SUCH LEGAL ACTION DISMISSED AND TO RECOVER THE COST OF OBTAINING THE DISMISSAL. FURTHER, THE FILING

OF ANY LEGAL ACTION IN VIOLATION OF THIS SECTION 29 SHALL NOT SERVE TO
TOLL ANY STATUTE OF LIMITATIONS OR TIME PROVISION SET FORTH IN THIS
AGREEMENT, THE LIMITED WARANTY OR APPLICABLE LAW.

30. MISCELLANEOUS.

The invalidity of any provision of this Agreement shall not affect the validity or
enforceability of any other provision of this Agreement. This Agreement and the rights and
obligations of the parties hereunder shall be construed in accordance with the laws of the District
of Columbia. With respect to the Condominium and abutting properties, Seller makes no
representations, oral or written, concerning future land use and reserves the right to change or
discontinue unit sales, models, or any portion of the property intended for the Condominium, or
alter easements areas at any time without notice. Any checks accepted by Seller shall be subject
to collection and payment. Seller has designated PN Hoffman, Inc., as its authorized sales
representative, for the sale of units within the Condominium.

31. ENVIRONMENTAL FACTORS.

Seller makes no warranty, either express or implied, regarding the presence or absence of
radon gas, asbestos, mold, lead in water, or any other hazardous substance or contaminant
(collectively, "Environmental Materials"), in, at or in the vicinity of the Condominium or the
Unit(s). Purchaser acknowledges that Seller shall not be liable for any damages related to the
presence of any Environmental Materials in, at or in the vicinity of the Condominium or the
Unit(s). By closing upon the Unit(s), Purchaser will be deemed to have released Seller from any
and all claims and liabilities relating to or arising from the presence of Environmental Materials
in, at or in the vicinity of the Condominium or the Unit(s), and from any and all responsibility for
mitigating or remediating any Environmental Materials that may be discovered in, at or in the
vicinity of the Condominium or the Unit(s). Purchasers acknowledges that water supplied to the
Condominium is provided by the DC Water and Sewer Authority (DCWASA), and that
published reports have revealed the presence of lead in certain samples of drinking water
supplied by DCWASA. Information on water supplied by DCWASA may be obtained from
DCWASA, the District of Columbia Department of Health, the U.S. Environmental Protection
Agency, and the U.S. Army Corps Washington Aqueduct. Purchaser acknowledges that Seller
shall not be liable for any damages related to the condition of water in the Condominium or the
Unit(s), including but not limited to the presence of lead in the water. This provision shall
survive Settlement.

18

32. RIGHT OF FIRST REFUSAL.

Purchaser hereby represents to Seller that Purchaser is purchasing the Unit and does not intend to sell the Unit for a period of at least twelve (12) months from the date that the Unit is conveyed to Purchaser. In order to induce Seller to sell the Unit to Purchaser, Purchaser agrees that the deed of conveyance from Seller conveying the Unit to Purchaser shall contain a express reservation in favor of the Seller (the "Repurchase Reservation") reserving unto the Seller the right, but not the obligation, to repurchase from the Purchaser the Unit on the terms and conditions set forth below in the event that Purchaser shall attempt to sell the Unit during the period that is twelve (12) months from the date of conveyance of the Unit to Purchaser (the "Repurchase Period").

In the event that Purchaser wishes to convey the Unit during the Repurchase Period, the Purchaser shall be obligated first to notify Seller in writing and Seller shall for a period of fifteen (15) days following its receipt of such written notice have the right (but not the obligation) to repurchase from the Purchaser the Unit at the same purchase price paid by Purchaser pursuant to this Purchase Agreement (the "Repurchase Right"). In the event Seller shall exercise its Repurchase Right, Seller shall thereafter be obligated to proceed to closing on the Unit within thirty (30) days following notification to Purchaser by the Seller of its exercise of the Repurchase Right. Should Seller exercise its Repurchase Right, Purchaser shall be obligated to convey to Declarant good and marketable title by special warranty deed and free of liens and encumbrances, and subject only to those title matters as to which Purchaser took subject to on the date of the conveyance of the Unit to Purchaser. The Unit shall also be vacant at the time of Settlement, and substantially in the same physical condition. The Seller shall be obligated to pay for all recording costs and other settlement costs in connection with its repurchase of the Unit, provided Purchaser shall pay the District of Columbia Transfer Tax (1.1%). Closing on the repurchase shall occur at the office of a title insurance company designated in writing by Seller. Real estate taxes and Condominium assessments shall be adjusted to the date of the closing on the repurchase. If Seller does not exercise its Repurchase Right, Purchaser shall be free to convey the Unit to a third party. Notwithstanding anything to the contrary contained in the Purchase Agreement, the provisions of this Paragraph shall survive Purchaser's closing on the Unit, and the repurchase rights granted to Declarant may be included in the deed of conveyance for the Unit.

The Repurchase Right shall be subordinate to the rights of any bona fide lending institution making a first deed of trust loan secured by the Unit to Purchaser hereunder and any such deed of trust lender shall take title free of all rights of repurchase in favor of Seller in the event of any foreclosure or deed in lieu of foreclosure.

33. PARKING RESTRICTIONS.

33.1  Purchaser acknowledges that the Condominium is subject to District of Columbia Zoning Order No. 02-17, Case No. 20-17, dated May 12, 2003, as amended by Zoning Commission Order No. 04-06/02-17A, Case No. 04-06, dated March 8, 2004 (collectively, the "Zoning Order").  The Zoning Order imposes various conditions and restrictions on the development and use of Condominium property and the owners, tenants and occupants residing therein.  As a condition of the sale of the Unit to Purchaser, Purchaser agrees that, for so long as the Zoning Order is in effect, neither Purchaser nor any tenant or occupant of the Unit shall seek or obtain a residential street parking permit so long as such Purchaser, tenant or occupant resides at the Condominium.  This restriction shall apply even if Purchaser does not own a Limited Common Element Parking Space, and even if there are otherwise insufficient parking spaces within the Condominium to accommodate Purchaser and/or any tenant or occupant of the Unit.

33.2  Prior to Settlement, and any time thereafter while Purchaser owns the Unit, Purchase shall disclose to Seller and/or the Association any information requested regarding Purchaser's automobile ownership and the automobile ownership of any others who reside or will reside in the Unit.

[SIGNATURE PAGE TO FOLLOW]



IN WITNESS WHEREOF, the parties have executed this Agreement this _23_ day of
~~December~~ , 2004.

Purchaser's Address:                                    PURCHASER(s):

4200 Military Rd NW
Washington DC 20015                                    _____
                                                       (Purchaser's Signature)

Date: _12/23/04_                                       _____
                                                       (Purchaser's Signature)

Telephone No. _202 537 2918_                           _____
       Home                                            Office

Email address: peterolle @ aol.com

SELLER:

5401 Western Avenue Residential, LLC

By: 5401 Western PNH, LLC

By: _____
        Authorized Agent

**NOTWITHSTANDING THE DELIVERY OF A DEPOSIT, AND SELLER'S SALES
REPRESENTATIVES ACKNOWLEDGING WRITTEN RECEIPT THEREOF, THIS
AGREEMENT IS NOT BINDING UPON SELLER UNTIL ACCEPTED IN WRITING
BY SELLER.**

21



## RECEIPT OF PUBLIC OFFERING STATEMENT

The undersigned acknowledge(s) that I (we) have received a Public Offering Statement for CHASE POINT CONDOMINIUM, 4301 Military Road, N.W., Washington, D.C. 20016.

Date:_____

_____
Purchaser

Date:_____

_____
Purchaser

22

## <u>NON-BINDING RESERVATION AGREEMENT</u>

For and in consideration of the sum of _One hundred twelve thousand four ninety five_ ($ 112495 ) (the "Deposit"), receipt of which is hereby acknowledged, 5401 Western Avenue Residential LLC (the "Seller"), as the owner of the Condominium (as defined hereinafter), hereby grants to _____ (the "Prospective Purchaser") the right to purchase the Condominium Unit identified as Unit No. _PH 1_ (the "Unit") in the condominium project to be known as The Chase Point Condominium (the "Condominium"), at a sales price of _Two million two hundred forty nine thousand nine hundred_ ($ 2249900 ) (such sales price is exclusive of any purchase price for a parking or storage space, if applicable).

1.    In the event that either party hereto cancels this Reservation Agreement pursuant to Paragraph 2 below, the Deposit shall be returned immediately to the Prospective Purchaser.

2.    This Reservation Agreement may be canceled (a) by the Prospective Purchaser, at the sole option of the Prospective Purchaser, at any time before entering into a formal purchase contract for the Unit (the "Purchase Agreement"), by written notice of such cancellation to the Seller, or (b) by the Seller, by written notice, if the Prospective Purchaser does not enter into a formal purchase contract for the Unit within forty-eight (48) hours after written notice is sent to the Prospective Purchaser that the Purchase Agreement is prepared, or (c) by the Seller, or Prospective Purchaser, if the Prospective Purchaser has not, for any reason, signed a formal purchase contract for the Unit with the Seller within Seventy-five (75) days from the date hereof, or (d) by the Seller upon giving notice to the Prospective Purchaser of the Seller's intention to abandon its plan to construct the Condominium.

3.    This Reservation Agreement shall be void (a) in the event of cancellation according to the terms of Paragraph 2 above, or (b) at such time as the Prospective Purchaser and the Seller enter into a formal purchase contract for the sale of the Unit. In the event that the Seller and the Prospective Purchaser enter into such contract, the Deposit given hereunder shall be credited toward any deposit required by such contract and the rights and obligations of the parties hereto shall be governed by the terms of such contract. It is expressly agreed and understood between the parties hereto that the Prospective Purchaser is not obligated hereunder to purchase the Unit.

4.    All notices required or permitted to be given hereunder shall be in writing and delivered personally or by mail to the parties at the addresses indicated below. This Reservation Agreement cannot be assigned by the Prospective Purchaser.

5.    Cooperative broker fee is not applicable to the purchase of the Unit.

NOTWITHSTANDING ANY PROVISION CONTAINED HEREIN TO THE CONTRARY, THE PROSPECTIVE PURCHASER ACKNOWLEDGES THAT THIS RESERVATION AGREEMENT IS NOT A CONTRACT, AGREEMENT OR BINDING OBLIGATION TO PURCHASE THE UNIT, AS SUCH MAY ONLY BE MADE IN ACCORDANCE WITH APPLICABLE LAW.

PROSPECTIVE PURCHASER:

_____ (SEAL)

Soc. Sec. # 322 46 5738

Date: _____

_____ (SEAL)

Soc. Sec. # 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

Date: _____

Address to which notices to the
Prospective Purchaser shall be sent:

4200 Military Rd. NW

Washington DC 20015

Phone # ( 202 ) 537 2918

Fax # ( 202 ) 537 2917

E-mail: Peterolle@aol.com

SELLER:

_____

By:    PN Hoffman, Inc., sales representative for Seller

By: _____

Name:  S. Mark Stahl

Title:  Vice President of Sales & Marketing

Address to which notices to the
Seller shall be sent:

PN Hoffman Sales & Design Center
4700 41st Street, N.W.
Washington, DC  20016

Dated: _____

**PLEASE MAKE CHECKS PAYABLE TO PN HOFFMAN ESCROW**

2

Exhibit 3

## CHANGE ORDER AGREEMENT

| | |
|---|---|
| **Chase Point Condominium** | |

| | | |
|---|---|---|
| **Chase Point Condominium** | Change Order No. | 1 |
| 4301 Military Road, NW | Date | 12/14/2006 |
| Washington, DC 20015 | Contract Date | 12/23/2004 |

| | | |
|---|---|---|
| Condominium No.   PH 1 | Seller: | **5401 Western Ave. Residential LLC** |
| | | C/O PN Hoffman, Inc. |
| Purchaser  Peter & Laura Olle | | 4725 Wisconsin Avenue, NW, Suite 200 |
| | | Washington, DC 200016 |

The Purchase Agreement is Changed as Follows:

| | |
|---|---|
| Add Storage Space # 9(Type B) | $9,300.00 |
| Type A-Full Masonry Enclosure: Locking Metal Door | |
| Type B- Partial Masonry Enclosure w/chain link fence; Locking Metal Door | |
| Type C- Chain Link Enclosure; Chain link door; Pad lock not included | |

| | |
|---|---|
| Change Order Amount | **$9,300.00** |

**Summary of Increase to Total Purchase Agreement**

| | |
|---|---|
| **Original Purchase Agreement Amount** | $2,291,900.00 |
| **Previous Change Order Amount (if applicable)** | |
| A/V & Mechoshades: | $30,148.00 |
| Selections Upgrades: | $3,725.00 |
| NSO's: | $21,948.00 |
| **Current Change Order Agreement Amount** | $9,300.00 |
| **New Adjusted Total Purchase Agreement Price** | $2,357,021.00 |

Unless specifically modified herein, all other terms and conditions of the Purchase Agreement shall remain in full force and effect.

This Change Order may be void at Seller's option if Change Order Deposit is not received within five (5) days of the date of this Change Order.

Purchaser, by signing below, acknowledges and accepts the New Adjusted Total Purchase Agreement Price herein.

Not valid until signed by Purchaser and Seller and additional deposit provided by Purchaser.

| | |
|---|---|
| Seller: _____ | Purchaser: _____ |
| Date: _____ | Date:  12/15/06 |



All dimensions and square footages are approximate.
Floorplans and buildout are subject to modification
and improvement without notice.

Exhibit 4



CHASE POINT
C O N D O M I N I U M

May 2, 2005

Dear Chase Point Purchaser:

Thank you for again for your purchase at Chase Point. We are excited to work with you over the next two years to complete and move you into your new residence. If you have not already heard from us, you will likely receive a call over the next month to schedule an appointment to start the finish selections for your new residence. These appointments will begin on May 19 and run through the entire summer. Finish selections and change orders must be completed no later than September 1, 2005.

I wanted to take this opportunity to describe this process in a little more detail and to answer questions that many of you have already asked. Please read this letter carefully and let us know if you have any questions prior to your appointment.

**Chase Point won't be completed until the end of 2006. Why are we doing finish selection appointments so early?**

Finishes and selections at Chase Point involve custom construction (i.e., cabinets) and materials selected from all over the world. In order to ensure timely availability, it is important for us to know well in advance exactly what materials we must build and order. Please give this process serious consideration because the September 1 deadline is **not** flexible.

**I wanted to make an appointment in May and was told I have to wait until June or July. Why can't I come in early?**

We want to allow you the careful consideration this process deserves. However, we ask you to be mindful of our staff resources. My associate, Avi Fisher, and myself, are the only staff available to meet with you to select finishes. At the same time that we are doing this, we are completing the sale of the building and working on other responsibilities at PN Hoffman. We want to spend time with each of you but please be aware that we can only do a certain number of appointments per week.

**Will I have choices in every aspect of the design of my apartment?**

As described in your marketing materials and the specification sheet which was an addendum to your Purchase Agreement, you will be able to make choices on flooring, kitchen and bath cabinetry, countertops and vanities, lighting, closet design and certain other optional elements



PN HOFFMAN
Sales & Design Center

4700 41ˢᵗ Street NW, Washington DC 20016    (202) 966-2100    www.PNHOFFMAN.com

like sound and video installations. You will be able to choose from a wide variety of options in these categories.

**What if I don't like your range of selections? Can I purchase my own choices for you to install?**

Unfortunately, this is not possible. Our finish selections were chosen in an attempt to appeal to the broadest possible range of buyers. They will not always appeal to everyone. Please know that we are quite confident that you are being given a greater range of choice at Chase Point than in **any** other condominium project currently available in the DC market. The construction process becomes completely unmanageable if we allow purchasers to "order off the menu" because we have no control over the timing and availability of those items. **If you aren't completely in love with our choices for a given product, you should choose the option closest to your ideal. Once you move in, you may find that you grow to like it. If not, you can always replace it later.**

**Can I make other changes or move rooms, walls, etc?**

In multi-story structures, mechanical, electrical and plumbing runs vertically in the walls between rooms. For that reason, it is usually not possible to move or change room sizes. Certain limited changes can be made. However, these changes must be requested through the NSO process.

**What is the "NSO" process?**

An NSO is a non-standard order. When you request a change not shown on the floor plan or spec sheets, the change will be described on an NSO form and circulated to PN Hoffman's design, development and construction departments. If such a change is possible from a design, engineering and construction perspective, you will be notified of that cost of that NSO and you may decide whether or not to proceed. Some NSO requests will be rejected because they are not possible from an engineering and design perspective. There will be a $100 charge for every NSO request and this charge will be collected whether or not the NSO is completed. This charge accounts for the considerable amount of staff resources required to evaluate an NSO request.

**Can I bring an interior designer to assist me in making selections?**

We are happy to have you bring a professional designer to assist you. However, please understand that our client relationship is with you, not your designer. For liability reasons, we will always communicate with you directly if there are questions or concerns outside the selection meetings. We cannot provide your designer with drawings, blueprints, specifications or documents other than the floor plans and spec sheets you received during the purchase process. If you meet with your designer outside our meetings and questions arise, we suggest that you put your designer's questions in writing and fax or email them to us. We will respond to you, not your designer.

I hope this letter helps to explain our procedures. I am happy to answer questions by phone or email prior to your selections appointment.

Regards,

David DeSantis
Sales Manager



# Chase Point Finishes

**Standard Options**

- (2) Kitchen Cabinet styles
- Viking commercial grade appliances
- (4) Hardwood flooring options throughout
- Lighting options throughout residence
- Range of granite countertops/backsplashes in kitchen.
- Natural stone choices in master bath, powder room, and foyer
- Porcelain choices in secondary bathroom and laundry
- Soaking tub (where applicable)
- (3) Bathroom vanity finishes
- Carpet selections for bedrooms
- California Closet fit out in master closet suite

**Preliminary Upgrades**

- Carpet to hardwood in bedrooms:
    - Master Bedroom-$4000
    - Secondary Bedroom- $3000
- Porcelain to stone upgrade:
    - Secondary Bathroom- $3000
    - Laundry Room- $1500
- Wainscoting upgrade:
    - Master Bath- $3000
    - Powder Room- $2000
- Kitchen cabinets antique/distressed style:
    - Range of $7500-$12,500 (depending on unit size)
- Glass cabinets in place of wood
    - Only over sink- $725
- Bathroom vanity in antique/distressed style:
    - $2500-$4000 (depending on unit size)
- Changing soaking tub to Jacuzzi bath- $2900-$3400
- Various Audio/Visual packages throughout residence:
    - Range from $5000-$14,000
    - Complete custom packages available



4700 41ˢᵗ Street NW, Washington DC 20016    (202) 966-2100    www.PNHOFFMAN.com

Exhibit 5



January 29, 2007

**Purchaser:   Olle**

**Unit #:        PH 1**

Dear Purchaser:

We are pleased to inform you that your Chase Point residence is ready for settlement. This letter serves as your formal written notice pursuant to Paragraph 7.1 of the Purchase Agreement that your unit is ready to be conveyed to you by 5401 Western Avenue Residential, L.L.C. Accordingly, please note the following times which have been scheduled for you to attend your pre-settlement walkthrough, final pre-settlement inspection and settlement date:

**Pre-Settlement Walkthrough**

Your pre-settlement walkthrough will be conducted at 8:30 am on Friday, **May 11 2007.** Please arrive in the lobby of the building ten minutes prior to your walkthrough time. A member of our Quality Assurance Team will escort you to your unit and conduct the walkthrough. If a home inspector will be participating in the walkthrough, please notify the PN Hoffman Uptown Design Center in advance. Please allocate approximately 1 hour for the walkthrough to allow our QA team to demonstrate features of your new home. We appreciate your cooperation in adhering to the schedule indicated above.

**Final Pre-Settlement Inspection**

Your final pre-settlement inspection is scheduled at 2:30 pm on Thursday, **May 17 2007.** This final inspection is intended to provide you with the opportunity to ensure that any issues or concerns expressed during the pre-settlement walkthrough are resolved.

**Settlement**

Your settlement will be conducted at Leibner & Potkin, located at 4725 Wisconsin Avenue, NW, Suite 250, Washington, DC. The office phone number is 202-244-0600, and Irma Thakkar is the settlement contact person. Your settlement is scheduled to occur immediately following your final pre-settlement inspection. **If you will be using an alternative settlement company, please provide us with their information (name, address, phone and contact) immediately. This information is needed so we can provide your settlement**



4700 41ˢᵗ Street NW, Washington DC 20016    (202) 966-2100    www.PNHOFFMAN.com

**company with the proper information.** The settlement process normally takes about an hour. Please call the settlement company one business day prior to closing to inquire about the estimated funds required to close. **These funds should be in the form of a cashier's or certified check.**

### Financing

If you have not already done so, please contact Renee Voyta, First Savings Mortgage, at 301-962-3004, Scott Hawkins, Wells Fargo, at 703-803-3500, ext. 2026 or Lenny Gordon, National City Mortgage, at 301-984-1400, ext. 222 to commence the loan application process. You are free to use the lender of your choice, so **please contact us immediately if you are not utilizing the seller's preferred lenders, and provide the name, address, phone and contact for your mortgage lender.** Please be aware that it is your responsibility to ensure that your lender processes your loan and that all of the loan documents arrive at the settlement attorney's office before the closing date. If your settlement date is delayed by you or your lender, you will be charged $165.00 for every day that settlement is delayed beyond the settlement date indicated in this letter.

### Move-In

A Move-in Coordinator for Zelco Management, the building property manager, will contact you to reserve a move-in date. PN Hoffman has established a "preferred mover" relationship with Paxton Van Lines, the local Atlas Van Lines affiliate. While you are not required to use this company for your move, PN Hoffman residents will receive preferred customer pricing and all Paxton customers will receive priority in move-in scheduling. More information is enclosed with this letter. Please also be aware that construction may still be occurring in some parts of the building when you move-in. In order to ensure an efficient move-in process for everyone, unscheduled move-ins cannot be accommodated. If you need to change your move-in date, please call Zelco to reserve a new date. Additionally, please be aware that you will be charged a $200.00 initial move-in fee at settlement pursuant to the Purchase Agreement.

We have also enclosed for your convenience a Pre-Settlement Checklist, which includes contact information for utility vendors. Please call to schedule all utility services effective the date of settlement.

We thank you for purchasing your new with us and hope that you are satisfied with the level of service that we have provided throughout the purchasing process. If you have any questions regarding your settlement, move in date, or the settlement process in general, please feel free to contact Verline McFadden at 202.232.1997, extension 207, and she will be happy to assist you, or you may contact me directly.

Sincerely,

The PN Hoffman Sales Team

Enclosures:    Pre-Settlement Checklist
               Leibner & Potkin Fact Sheet
               Paxton Van Lines Flyer
               Comcast Flyer
               Robin Technologies DishNetwork Flyer

cc: Verline McFadden

Exhibit 6

Laura and Peter Olle
4200 Military Road, NW
Washington, DC 20015

March 30, 2007

Mr. David DeSantis
PN Hoffman
4700 41st Street, NW
Washington, D.C. 20016

RE: 5401 Western Avenue Residential, LLC, Unit 801

Dear Mr. DeSantis:

The purpose of this letter is to exercise our right to terminate the purchase agreement for Unit PH1, Parking Spaces 4 and 5, and storage space #9 at the Chase Point Condominium and receive back our deposit. Closing under the contract was to have occurred within 2 years from the date of the contract, December 23, 2004. Unfortunately, the unit was not ready for settlement. Moreover, the unit promised is substantially different than the unit being constructed. This includes (i) the family room being approximately 10 feet narrower than described to us, (ii) our inability to install a grill on the balcony according to the published bylaws, (iii) two electrical room doors which break up the only wall in the loft, (iv) electrical outlets being on the wrong wall in the media room, and (v) an inability to add a powder room as promised in the loft. These differences substantially change the nature and character of the unit which we agreed to purchase.

Please call us at (220) 537-2918 if you have any questions.

Sincerely,

Laura and Peter Olle

Exhibit 7

PN HOFFMAN

4225 Wisconsin Ave NW, Suite 155
Washington, DC 20016

tel 202.686.0971
fax 202.686.0089
www.pnhoffman.com

April 2, 2007

Laura and Peter Olle
4200 Military Road, NW
Washington, DC 20015

Dear Peter and Laura:

We were obviously extremely disappointed to receive your letter of March 30, 2007 indicating your desire to terminate your Purchase Agreement for Chase Point unit PH 1.

Let me address this issues you have raised in your letter:

1) Date of Settlement – You are correct that the Purchase Agreement does include language which, in the absence of other factors, suggests that settlement should occur on or before 24 months from purchase. However, in the case of Chase Point, there were several unanticipated permit issues outside of the Seller's control which resulted in minor delays. You will note that the Purchase Agreement does make an exception for these types of issues. Also, we provided you with official notice of settlement on January 29, 2007 and you waited two months to raise this issue. Precedent in this area suggests that the "settlement clock" stops ticking after official notice has been provided and certainly once the buyer has been given 60 days to contemplate the notice.

2) Interior Issues - I am not sure which room you are calling the family room but as you know, your Purchase Agreement did include a floor plan with approximate dimensions which you initialed indicating that you had read and understood the document. While I am not pleased that you are unhappy with this room, we have delivered what was indicated on the documents. On a related note, the doors to the mechanical closets in the loft are noted on the floor plan as well. With respect to the electrical outlets being on the wrong wall in the media room, the outlets have been placed according to code but we can certainly discuss moving them for convenience and would be happy to have our quality assurance team address that.

3) Barbecue Grill – You are correct that the original draft of the By-laws does contain language forbidding the use of outdoor barbecues. As I told both of you by phone and email, we recognize this error because building code does permit the use of barbecues on rooftop terraces and we intend to issue a written clarification. As you know, we also agreed to provide the grill itself at no additional charge and certainly would not have done so if grilling would not be permitted.

4) Powder Room – In your Purchase Agreement, you asked for and received a wet bar on the upper level of your residence. We made no representations verbal or written about our ability or anyone else's, to install a bathroom in that space.

Because none of the issues you have raised indicate a default under the contract on the part of the Seller, you are obligated to go to settlement on PH 1. If you choose not to do so, you will be held in default under the Purchase Agreement and the Seller will retain your deposits as liquidated damages.

I sincerely hope it does not come to that and that we can make accommodations that make you feel better about moving forward.

Sincerely,

David DeSantis
VP, Sales & Marketing
PN Hoffman
Agent for Seller

Exhibit 8

Laura and Peter Olle
4200 Military Road, NW
Washington, DC 20015

April 3, 2007

Mr. David DeSantis
PN Hoffman
4700 41st Street, NW
Washington, D.C. 20016

RE: 5401 Western Avenue Residential, LLC, Unit 801

Dear Mr. DeSantis:

Thank you for you letter of April 2, rebutting my points from March 30th. Below are my responses to yours.

1. Date of Settlement – Settlement did not occur within the twenty-four month period after the execution of the agreement. We were given no indication that events outside of the seller's control had happened until yesterday's letter.

2. When we began discussions with PN Hoffman, the marketing plans had the measurements of the Living/Dining room as 34x24. During the sales process, we were told this was incorrect and the room was approximately 34x46. When we actually signed the purchase agreement, the marketing materials indicated the dimensions as 31.6x44. When we went to contract, we were given a floor plan to sign, and we did. We were not told that the dimensions had changed to 22x31.4, nor did we have any reason to scrub the document to see if anything had changed. The measurements on the document were so small as to not be legible. On 1/23/07, the web site showed the room dimensions as 34x24. In a 1/22/07 email, we asked what happened to the 31.6x44 dimensions. We were taken aback during the walkthrough when we saw how small the room turned out. This was the major selling point of the condominium.

3. Barbecue Grill – The contract includes a gas grill installed on the terrace. The bylaws specifically prohibit such a grill. I asked for a written waiver to the by laws, but none was produced.

4. Powder Room – Our discussions from day one were focused on adding a powder room to the loft. In an 11/1/05 email, Avi Fisher stated "The plumbing now used for the wet bar was intended on being the plumbing for a potential powder room". The original plans always had one door for the electrical room, leaving a wall that could have been built out as a powder room. Now that two doors have appeared on that wall for two separate electrical rooms (that were never in the plans), there is no longer a wall on which to build out a powder room.

David, at this point, I would like you to know that our objective is to receive a refund on our deposit. Please call us at (202) 537-2918 if you have any questions.

Sincerely,


Laura and Peter Olle

Exhibit 9

**FRIEDLANDER ᴍISLER**

A T T O R N E Y S     A T     L A W

1101 17th STREET, NW          TEL. 202.872.0800
SUITE 700                     FAX. 202.857.8343
WASHINGTON, DC 20036-4704     www.dclawfirm.com

FRIEDLANDER, MISLER, SLOAN, KLETZKIN & OCHSMAN, PLLC

Robert E. Greenberg
Of Counsel

Direct Fax: 202.530.0364
rgreenberg@dclawfirm.com

August 2, 2007

**_By Hand Delivery_**
Mr. Lamont Hoffman, Registered Agent
5401 Western Avenue Residential, LLC
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016

       **_Re:_**    _Peter and Laura Olle; Unit PH 1 Chase Point_
            _Condominium; Final Pre-Litigation Demand for Deposit_
            _Refund._

Dear Mr. Hoffman:

      This firm and the undersigned represent Peter and Laura Olle, contract purchasers of Penthouse Unit 1 in Chase Point Condominium.  We write to you in your capacity as the registered agent for the addressed legal entity.  If you are represented by counsel, we suggest you place this letter in their hands immediately.  This letter constitutes a singular pre-litigation settlement demand under Federal Rules of Evidence Rule 408.

      The facts as we understand them based on our investigation to date are these.  On or about October 4, 2004, the Olles' entered into a "Non-Binding Reservation Agreement" whereby they agreed with 5401 Western Avenue Residential LLC, as the owner or contract purchaser of the property ("Seller") for the right to purchase Penthouse Unit 1 (the "Unit") for approximately Two and One-half Million Dollars in a to be built condominium project to be known as "The Chase Point Condominium."  At that time they also gave Seller a deposit therefor of One Hundred Fourteen Thousand Five Hundred Ninety-five Dollars.

      On or about the 23rd of December 2004, the Olles executed the formal sales contract for the purchase of the Unit, together with limited common element parking spaces numbered four and five for a total price of Two Million Two Hundred Forty-nine Thousand Nine Hundred Dollars and Forty-

FRIEDLANDER MISLER

Mr. Lamont Hoffman, Registered Agent
5401 Western Avenue Residential, LLC
August 2, 2007
Page 2

two Thousand Dollars, respectively.  The Olles also increased the previously made deposit by a like amount resulting in a total cash deposit of Two Hundred Twenty-nine Thousand One Hundred Fifty Dollars (the "Deposit"). The Seller ratified the Contract on or about January 14, 2005.

By virtue of a subsequent Change Orders Agreement dated December 15, 2006, the Olles made additional payments to Seller totaling Thirty-two Thousand Five Hundred Seventy-eight and 50/100 Dollars.  For purposes of this letter and the Olles' demand, the total amount at issue is Two Hundred Sixty-two Thousand One Hundred Seventy-three and 50/100 Dollars, exclusive of interest and attorneys' fees.

Contract § 2.2 obligated the Seller to hold the Deposit "in an interest-bearing escrow account in a bank or savings and loan association" as required by local law.  Any interest earned on the Deposit was to be added thereto. But, the Deposit would "not be deemed to include any amounts paid for Options."  Further, § 2.3, of the Contract provided that the Deposit would be credited to the Olles if the parties closed the transaction; and otherwise forfeited to Seller if the Olles "default."  In addition, the Olles would forfeit "any other amounts paid under [the Contract] . . . including any amounts paid for Options, which may be retained by Seller as liquidated damages."

With respect to closing the sale, Contract § 7.4, provided that if closing did not occur within twenty-four months after the execution of the Contract by the Olles (December 22, 2006) due to reasons within Seller's control, all the Olles could do was terminate the Contract by written notice to Seller (before Seller established a closing date) and receive a refund of the Deposit (but not the cost of Options), or wait until the Unit was completed and Seller called for closing.  These remedies were the Olles' "sole and exclusive remedies in the event of any default by Seller, it being expressly agreed and understood that [the Olles] . . . [were required to] waive[ ] any claims against Seller for any monetary or consequential damages of any kind."  This Contract provision effectively eliminated the Olles' right to sue for specific performance and or damages under District of Columbia law.

FRIEDLANDER MISLER

Mr. Lamont Hoffman, Registered Agent
5401 Western Avenue Residential, LLC
August 2, 2007
Page 3

Moreover, Seller only obligated itself to use "reasonable efforts to complete construction of the Unit," and convey it within the time when Seller was legally obligated to do so, *viz.,* December 22, 2006, and further reserved to itself the right to delay its obligation to close beyond that date "for reasons beyond the control of Seller," which Seller defined without limitation, to include "impossibility of performance, acts of God, fire, earthquake, flood, explosion, terrorism, condemnation, or acts of governmental agencies asserting jurisdiction over the Condominium or the Property, and any other legally supportable justification under the laws of the District of Columbia, which would excuse Seller from completing the Unit" within the required time. Finally, if closing did not occur due to any of those reasons, Seller's sole obligation to the Olles was to refund the Deposit and fees paid for Options.

On May 2, 2005, Seller advised the Olles in writing that the Chase Point would not be completed until the end of 2006. Seller next purported to give the Olles the notice of closing referenced in § 7.1 of Contract. But, the pre-settlement walkthrough was not scheduled to be held until May 11th, because the Unit was not completed subject only to minor punch list items as described in §9.1 of the Contract.

On March 30th the Olles advised Seller they felt deceived about the size of two of the rooms in the Unit because the marketing materials falsely and deceptively showed the dimensions to be in excess of one hundred square feet larger than the delivered measurements of the Unit when notice of closing was given to the Olles.

On April 2nd the Seller essentially defaulted the Olles for raising the deceptive marketing of the Unit and for seeking to exercise their right to rescind as provided by both federal and DC law. The Seller then forfeited the Olles Deposit.

Finally, while Seller had the Olles acknowledge in § 24.1 receipt of a copy of the Public Offering Statement, filed with the District of Columbia, Department of Consumer and Regulatory Affairs, the Olles were never given

FRIEDLANDER MISLER

Mr. Lamont Hoffman, Registered Agent
5401 Western Avenue Residential, LLC
August 2, 2007
Page 4

a disclosure statement as required by the Federal Interstate Land Sales
Disclosure Act ("ILSDA" or "Act"), and regulations issued thereunder.  It is
this failure that constitutes the Olles first claim against Seller for return of
the entire Deposit (including interest accrued to date of repayment) and all
sums paid for Options, because the entire Contract is voidable at the Olles'
election at any time.  In addition, because Seller deceptively marketed the
Unit, and continues to do so, the Olles are entitled to damages under DC law
for violation of the DC Consumer Protection Act, equal to the amount of the
Deposit, together with interest and attorneys' fees.

But, primarily, Seller is subject to, and liable to, the Olles under the
federal regulatory scheme requiring every developer seeking to sell land and
or improvements in interstate commerce to register and make certain
disclosures, unless otherwise exempt.  As far as we can determine on behalf of
the Olles, none of the *per se* exemptions apply inasmuch as Seller has offered
for sale more than ninety-nine units, thereby exceeding the limit of §
1403(b)(1) of the Act.  As a result of the number of non-exempt units, the
ILSDA requires formal registration with the Department of Housing and
Urban Development ("HUD") and preparation of, and timely distribution to
purchasers of a disclosure statement conforming to the Act and HUD
regulations thereunder.

Finally, for reasons we need not elaborate now, because the
construction purported to be performed by Seller under the Contract
admittedly was not completed within two years from the date the Olles signed
the Contract, the sale to the Olles is not exempt under § 1403(a)(2) of the Act.

Inasamuch as the Seller is not exempt under any provision of the
ILSDA and failed to register and make the required disclosures to the Olles,
the Seller has violated the ILSDA.  Pursuant to § 1410 of the Act, the Olles
will bring an action against the Seller and its various agents for the sale
made in violation of section 1404(a), and they will seek damages, equal to the
amount of the Deposit (with interest) and the options, any increase in the

**FRIEDLANDER MISLER**

Mr. Lamont Hoffman, Registered Agent
5401 Western Avenue Residential, LLC
August 2, 2007
Page 5

value of the fair market value of the Unit, court costs, and reasonable amounts for attorneys fees.

In order to avoid the contemplated litigation, Seller is herewith offered the opportunity to refund the Two Hundred Sixty-two Thousand One Hundred Seventy-three and 50/100 Dollars that Seller received from the Olles, plus 6% interest thereon calculated as of the date each portion of the Deposit and Options payments were received through the date of repayment.

This offer will remain open for a period of ten days after which time it will automatically expire without further act or notice by the Olles, and the Olles will immediately seek redress in other forums.

If your representative has any questions, or cares to discuss any of the points made in this letter, please have them call me. But, in any event, please be governed in accordance with the demand for repayment made in this letter.

Sincerely,

Robert E. Greenberg

cc:    Client (by email)

U:\greenberg\CLIENT\Olle\Ltrs\Refund Demand 8-1-07.wpd